So our next case for argument, cases, are United States of America v. Daniel Kiraz and George Kiraz. Each side has 15 minutes. Thank you, Your Honor, and I believe we're splitting that, so I'll be as brief as possible. May it please the Court, Your Honors, Mr. Counsel for Defendant Appellant Daniel Kiraz, and we have raised in our appeal a single claim of trial court error for denying Rule 29 motions for judgment of acquittal, which were made during or after the government closed its case in chief and then again at the conclusion of proceedings. Which is a sufficiency of the evidence issue, is it not? It is, Your Honor, and I understand that it's de novo review. From our perspective, as the Court knows from reading the submissions, Daniel Kiraz was acquitted of counts 5 and 6, convicted of count 7, and also convicted of count 1, which was the conspiracy charge, count 7 being the aiding and assisting charge. It is Up of the 2010 return? Yes, sir. So from the defendant's perspective, from our perspective, we can assume from the verdicts that the jury reached that Daniel Kiraz was convicted of the conspiracy based on the conduct that was alleged in count 7, because it wouldn't make sense that the jurors would have acquitted him for the 2008 and 2009 aiding and assisting false submissions of returns if that were not the case. And as to count 7, we believe the evidence reduces to the testimony of one individual, one witness, Stephen Townsend, and Mr. Townsend was a tax preparer who testified that in 2011, March of 2011. What about Ashley Carroll, who was a bookkeeper and testified that Daniel trained her to write down on a piece of paper each day the revenues from the revenue streams of the club, including sale, house fees, door fees, credit cards, and ATM. And then he also trained her to input those numbers minus the house and door fees, which were being skimmed into a spreadsheet on the club's computers. The spreadsheet at the club did not contain the columns in which the skimmed house and door fees information would be inputted. That was George's money. Now, doesn't that evidence show that he knew what was going on as far as not reporting the house and door fees? In isolation, perhaps, but not in light of all of the evidence. But isolation is all we're talking about, insufficiency of the evidence on Rule 29. I believe, Your Honor, that Ashley Carroll also testified that she entered house and door fees into the spreadsheets at times. And I know that they're— At times, right? At times not. The jury could hear that. But the question is, was there sufficient evidence that a reasonable juror could find that your client was in on the game? My position is no. My position is that Vance Edwards is the individual that trained Daniel Kress. Vance Edwards, I believe, testified that in 2010, around 2010, he left. And that is at the same time that the Cabaret III was coming into existence, which draws me back to the Stephen Townsend issue. And Vance Edwards, I believe his testimony was that Daniel Kress didn't know what he was doing, didn't know how to run a club. And Ashley Carroll herself indicated that most of her job was ministerial, that she didn't consider it actual bookkeeping. It was more data entry. And that is cited within my brief as well. Didn't he know that there were two sets of books? No. Not at all? No. I don't believe that the Court can infer that from the evidence. So the second set of books— Wait a minute. The spreadsheet that Ashley Carroll prepared had columns for each of the sums of money. Two of the columns were house and dancer fees. Those were on the sheets that she wrote out by hand, but those were not put in the computer as to house and dancer fees. Correct. So there was a discrepancy between case one, which is the writing that she did, and she was instructed how to do that by Daniel, and case two, what she was putting into the house computers, the difference being the two items which were skimmed. During that same time period, I believe, Your Honor, that you will see an exhibit. And I was trial counsel, so I know that I highlighted this during my closing argument. Daniel Kress had prepared a spreadsheet for use by the bookkeepers that had the columns for the house and door fees. Later, he did that. It was around that same time period. But even so— In July of 2010, but not before then. Correct. We have a period— And we're talking about the 2010 tax returns, which were then the subject of the meeting in March 2011. Correct. So, again, as far as the second set of books is concerned, the second set of books were stored in David Kress's computer. There was no evidence ever linking Daniel Kress to that second set of books, other than the testimony, I maintain, of Stephen Townsend. And Stephen Townsend himself could not recall, in fact, definitively whether Daniel Kress was the person that had given him the spreadsheet that he had. There were two second sets of books. One was the house computer, in which there was no house and—and dancer—house and door fees, and David's computer. So there were two computers that were being used, the house computer and David's computer. The house computer is the first set of books. Yeah. The second set of books was the—was supposedly— Well, the input to the house computer was a paper done by Carroll. And that had the two items which were skimmed. The house computer didn't have those two items. David's computer had those items. Right. And the spreadsheets that were submitted to Stephen Townsend were spreadsheets ultimately the government established did have the house and door fee—or did not. Excuse me. Did not. Did not have the house and door fee columns in them. But again, at this same time period, all the Kress's were present and having their own tax returns done by Mr. Townsend. And I keep looping back, but that's the essence of my argument, is that Stephen Townsend was not anywhere close to definitive as to Daniel Kress providing him that second set of books. And Daniel Kress's acts during the 2010 were really no different than any other bookkeeper's acts. And I'm not sure if my time is, like, for both of us that's running here. Okay. Well, then I'll—unless the Court has questions, I'll sit down. Okay. Thank you. And good morning. My name is Adam Dean. May it please the Court, I'm here representing George Keras. We are essentially here on many of the same arguments in terms of sufficiency of the evidence. Although my client was found guilty of the conspiracy as well as the assisting in the filing of a false return that was 08, 09, and 010, 05, 06, and 07 in terms of the counts. And so there were obviously significant evidence presented that Mr. George Keras was responsible for much of the day-to-day operations. There was testimony, of course, that there was significant other folks who were also responsible for day-to-day operations. However, there was no evidence that really other than ultimately hiring some bookkeepers that he was intimately involved in terms of any of the actual responsibility for the day-to-day to David Keras. But there was lots of other folks who were doing that as well. There's also evidence that Mr. George Keras was knowledgeable in regards to actual income. Your Honors have very likely seen the videotape in which the undercover officer, the IRS agent, came in, went ahead and was attempting to at least act as if he was buying. And Mr. Keras provided some income information. But that doesn't get to the issue of whether, in fact, there was a conspiracy. All it indicates is that he was aware of the actual income that was being produced by the club. And so the government had essentially set forth the four overt acts. And the brief goes through and talks about each one of those in terms of the lack of sufficiency of the evidence, a, the destruction of records. There was really very little evidence that, in fact, there were very many records destroyed at all. Quite to the contrary, an expert witness called by Daniel Keras, Tiffany Couch, was able to go ahead and put the actual numbers together based on all of the records. So again, there was very little evidence other than Vance Edwards. Vance Edwards provided some testimony about being told by a number of individuals that he should be destroying the record. His testimony, quite frankly, in terms of cross-examination, was unclear, a, what those records were, and b, whether, in fact, he went ahead and destroyed them. And also, just as importantly, that was also relating to Marcy Keras. And, of course, the jury found that there was insufficient evidence in terms of the ultimate question of guilt to find her guilty, and she was acquitted. Scalia. Counsel, we have this standard of review here, which I assume you would agree means that we look at the evidence in the light most favorable to the prosecution. Haven't you already identified sufficient evidence? McConnell. I don't believe so, because again, as I also indicated, the evidence just has to be more than mere speculation. It has to, of course, be enough for a reasonable trier of fact to make a determination that Mr. George Keras committed these overt acts. And again, there is simply insufficient evidence in this record, again, even viewing, even under that standard of review, that, in fact, Mr. George Keras did anything in terms of destruction of records. Kennedy. Mr. Grafson, let me ask you a question. Wasn't George the person who presented the financial statements to the income tax preparer in 2008 and 2009? Daniel wasn't involved in those. Grafson. Right. Kennedy. He presented those documents, right? Those documents didn't include the skimmed items. Grafson. The answer is it was very unclear. And if you look at, I believe, Mr. Keith Evans' testimony, who was the provider, who was the preparer, he was somewhat unclear in terms of exactly what those records, in fact, were, and in fact, in terms of income information. He was using them to prepare tax records. They were income and expenses net taxable. Grafson. I understand, but as... Kennedy. If your income is missing two items, it tends to be lower. Grafson. Well, just like counsel indicated, he was also present there to, in fact, go ahead and have his own tax returns prepared at the same time. So, again, he was there also providing his own information. Kennedy. Is your argument that since George was providing the house and door fees on his own income as George's money, I think it was referred to by some of the managers as George's money, then there's no loss to the IRS? Grafson. Well, the answer is that Mr. Evans was, unfortunately, unable to go ahead and what the nature of that income was. When he was questioned whether, in fact, precisely what the actual document that was provided contained, what that contained, he was unable to go ahead and provide sufficient evidence from our perspective, even viewing his testimony in the light most favorable to the government. Kennedy. All right. In terms of the other overt acts, again, the maintenance of the second set of the profit and loss, again, there is absolutely no evidence that, in fact, Mr. George Keras knew the existence of the second set of the profit and loss. Again... Grafson. Wait, wait, wait. Didn't George daily tell David, the owner, what the take was? Yes, but just like many, many other folks went ahead and, quite frankly, all the managers were also doing that on a daily basis as well. And so just because, in fact, the managers or Mr. Keras were providing those daily numbers on a daily basis doesn't, I think it is insufficient evidence to make the inference, then, the jump that, in fact, that Mr. George Keras knew that there was a second set of books and, in fact, was involved in any activity in terms of either their creation or their maintenance. Same thing in regards to the, we've already discussed in terms of the inaccurate info to the preparers. Again, I submit that based on Keith Evans' testimony doesn't get us there in terms of the 2010. Pete Townsend was the last preparer to go ahead and provide that also insufficient evidence in terms of that Mr. George Keras did anything at that meeting to go ahead and provide insufficient evidence. Who was at that meeting? George? Yes, he was. Daniel? Yes. And that's it, right? Correct. Well, no, I believe there was a testimony, if I'm not mistaken, that David was also present. So your position is that David's the one who handed the documents to Townsend, although that's not what he said the first time around. I understand, but, again, he wasn't, he did not. The bookkeeper of the three of the Keras family was Daniel, right? That's correct. That's correct. Okay, Counselor, your time is up. Thank you. Appreciate it. Thank you very much. Thank you. May it please the Court, I'm Seth Uram, Assistant United States Attorney for the United States. Your Honors, it's not disputed that the Keras strip clubs operated with two sets of books. Could you use the microphone? Yes, Your Honors. Just keep your voice up. I think I've developed a little fall sore throat. It's not disputed that the Keras strip clubs operated with two sets of books or that David Keras filed false tax returns that didn't report a million and a half dollars in that cash house and door income, and the defendant's own expert forensic accountant, Tiffany Couch, testified that she traced that unreported money to the bank accounts of both Daniel Keras and George Keras. Her testimony appears in Daniel's government's excerpt of record at 198. Now, George Keras, as you just heard, believes that the evidence was not sufficient to convict him because he didn't really have any understanding of the accounting process at the strip clubs. But that ignores the interview he gave with Special Agent Scott McGeechee the day of the search During that interview, George Keras described the club bookkeeping in detail, including how the clubs used Excel spreadsheets to keep track of all of the revenues. That's at government's excerpts 66 and 67. And, of course, you've mentioned that George Keras daily acted as a conduit of the take, to David. George Keras agrees that he did that. In fact, in his brief, he says it's an undisputed fact he did that. But he denies that that gave him any knowledge that David was entering those figures every day in a particular order on a second set of books. The record says otherwise because when David Keras testified on direct examination and explained how this conduit process began, he said that because he stayed up late at the clubs and he got up late the next day, he needed somebody in the family to in his computer. This appears at the government's excerpt of record for George Keras at page 180. And I'm going to read exactly what David Keras testified. He said, quote, after explaining what I just said, he said, quote, I got in a routine where I would ask my dad to take the numbers for me. And then he said, I'll call you, meaning George, when I get up and I'll put them in my computer. So there's conclusive proof that George Keras knew that David Keras was entering the house and door information and all the other information in a second set of books. It just is in the face of this record really cannot be genuinely disputed. Of course, you correctly stated, Judge, that when George Keras was negotiating the sale of the strip clubs with the undercover agent, he showed a really quite masterful understanding of all of revenue numbers. And in fact, he told the special agent during this April 2011 interview that the reason he was negotiating for the sale instead of his son, David, who owns the clubs, and you would expect as an owner would have a better understanding of the numbers, that he, George, had a better understanding of the club's revenues than even the owner. Mr. Keras would also like to say that the record does not support that he committed any of the overt acts alleged in Count 1 in support of the conspiracy. And, of course, the jury was properly instructed by Judge Jones that none of the defendants had to personally commit an overt act. An overt act just had to be committed by someone involved in the conspiracy. Those instructions are in George's excerpt of record at 49 and 51. So it's not contested that David Keras filed false tax returns. Those are the overt acts alleged as overt act number four in Count 1. Mr. Keras, George Keras, also called the bookkeeper, Vance Edwards, who had been the longtime manager who converted to being a bookkeeper, to make sure that he was getting rid of the old house and door records after Marcy Keras told Edwards to sort of pick up where she left off. She came to him all dirty and disgusted about having to do it, and she ordered him to do it. And Mr. Edwards testified that George Keras called him to make sure he was getting it done, and that's in our excerpt at record at 16 to 18. And that's overt act number one alleged in the indictment. I've already explained how George Keras was knowingly and directly involved in the daily use of the second set of books, which is overt act number two. And, of course, you've discussed with Mr. Keras' counsel that he gave these two false spreadsheets to Mr. Evans, the return preparer who could prepare the 2008 and 2009 tax returns for David Keras. That's overt act number three. So the record clearly supports, frankly, even without the benefit of the appellate standard of review, that George Keras committed all of the overt acts that are alleged in Count 1. Now, with respect to Daniel Keras, I'd just like to clean up a little factual, I think, error, unintentional by Mr. Greffinson. Ashley Carroll, who was one of the bookkeepers that Daniel Keras trained, worked at the clubs and did its books from mid-2009 to mid-2010. That's in the government's excerpt of record from her testimony at pages 26 and 33. So Ashley Carroll did the books for a year, and that was before the house and door daily amounts were put in the first set of books. So she left by the time that happened. Let me ask you this. Yes, Your Honor. With respect to Daniel Keras, what exactly did the government have to prove with respect to the two counts in which he was convicted? Well, for the conspiracy count, and this actually is — I'll answer this by addressing Mr. Greffinson's argument that the acquittal on count for the 2008 and 2009 substantive offenses mean he should not have been convicted for either of the other counts. The answer to that argument is in the elements of the two offenses, because the conspiracy count describes a crime that is the agreement to commit the crime, not the substantive committing of an offense as the other counts did. So it is quite likely that the jury found that from all the circumstantial evidence of Daniel Keras' involvement in the tax cheating scheme, which includes some conduct that I'll talk about in a moment that we haven't addressed yet, but they found that all of that conduct indicated he agreed to help, you know, with the families basically to enter into the family tax cheating conspiracy. But when it came to the substantive offense of aiding and assisting, which requires some significant act to assist, the jury found only that Daniel Keras' handing over of the false spreadsheet in 2010 to that tax repair — return preparer satisfied that element. Their biggest argument, or strongest argument, is that when the accountant testified at the trial, he couldn't actually say for sure that Daniel Keras handed over the spreadsheet. Well, Mr. Townsend's testimony began, in his direct testimony, by saying unequivocally that Daniel handed him the spreadsheet and answered questions about it at the meeting. On cross-examination, Mr. Greffinson did a good job working with what he had. And to set up his cross-examination, he had Mr. Townsend discuss the interview that he gave with the IRS case agent just 10 months after the meeting. And Mr. Townsend testified that in that interview, he also told the special agent, when his memory was presumably much more fresh than when he was testifying, that Daniel Keras gave him the spreadsheet. So the jury hearing that Mr. Townsend told the special agent just 10 months after the meeting that Daniel gave the spreadsheet to him and then testifying at trial that Daniel gave the spreadsheet to him and answered questions, the jury was much more likely to believe, and apparently did believe, that Daniel, in fact, did give him the spreadsheet. Mr. Greffinson did the best job he could to have Mr. Townsend express a little bit of uncertainty, but of course, that didn't work at the trial court level. And under the review standard here, the Court has to assume, has to take it in the light that's most favorable to the government, that Daniel handed it to him. The reports that would also support the jury's finding? For both counts? For Daniel, yes. Yes, Your Honor. Mainly the substantive count. Well, at that time, of course, Your Honor, bookkeepers that Daniel trained were, for the first half of 2010, not entering the house and door fees in the first set of books. For the entire year, those bookkeepers were transmitting either to George Kiras, but sometimes to Daniel Kiras, the daily take from the previous day's take to be transmitted to David. Even without David's testimony, that he told his father he was entering these numbers in his computer into the second set of books, it's almost impossible not to believe that the jury understood that both Daniel and George knew that David was working on a second set of books. And although it's nowhere in the record, it's a reasonable inference that if David told his father that's what he was doing, he told his little brother that's what he was doing. So all of the bookkeeper-related functions that Daniel continued to do into 2010 by themselves should have supported the substantive conviction, but certainly when added to the pretty strong testimony of Mr. Townsend that he handed over that false spreadsheet. Now, the other thing I want to point out, because it's a little not obvious detail, but it's important, is it's not disputed that for the second half of 2010, the first set of books had house and door revenues put in them on columns off to the side. There were still no specific columns for house and door. And Mr. Townsend testified that he believed, based on the context of his conversation in that meeting, that Daniel had printed out the spreadsheet that he got for 2010. But that spreadsheet had no house and door revenues on it. That means that Daniel had to take the extra step of removing the six months of house and door that was recorded on the spreadsheet in order to give what I'll call a clean spreadsheet, a clean false spreadsheet, to Mr. Townsend. And there's all the testimony in the case was consistent that Daniel was the only person who had the knowledge to use those spreadsheets. Okay. If there's nothing further, thank you, Your Honor. Okay. The case is submitted. I think you used up all your time. Thank you.
judges: O'scannlain, Paez, Bea